IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Jaynell Ronald Reid, | ) | C/A No.: 1:13-3390-RBH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On May 25, 2012, Plaintiff filed an application for DIB in which he alleged his disability began on April 25, 2012. Tr. at 143–150. His application was denied initially and upon reconsideration. Tr. at 94–97, 99–100. On July 15, 2013, Plaintiff had a hearing

before Administrative Law Judge ("ALJ") Ronald Sweeda. Tr. at 25–64 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 3, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–24. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 4, 2013. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 35 years old at the time of the hearing. Tr. at 29. He completed high school. Tr. at 30. His past relevant work ("PRW") was as a fast food cook, an aircraft maintenance worker, a milk inspector, a heavy equipment operator, and a milk receiver. Tr. at 53–54. He alleges he has been unable to work since April 25, 2012. Tr. at 30.

2.    Medical History

On September 17, 2009, Plaintiff was examined by orthopedist Matthew B. Massey, M.D., who noted that he ambulated with a limp secondary to leg-length inequality and his right leg was one inch longer than his left. Tr. at 483. Dr. Massey also observed Plaintiff's right leg was larger than his left. *Id.* He had full range of motion bilaterally, but demonstrated crepitus on the right. *Id.* He had no instability or focal deficits, but he had bilateral quad weakness. *Id.*

On May 12, 2010, Plaintiff presented to Arthur Wolinsky, M.D., complaining of pain in his left knee, ankle, shoulder, and right knee. Tr. at 479. He indicated that it was

exacerbated by activity/exercise, prolonged sitting/standing, and stair climbing and alleviated by sleep/rest and medications. *Id.* A screening test for post-traumatic stress disorder ("PTSD") was negative. Tr. at 481.

Plaintiff presented to the Veterans Administration Medical Center ("VAMC") on November 2, 2010, complaining of pain and stiffness in his neck and left shoulder. Tr. at 466. Linda S. Gibson, NP, noted tenderness over Plaintiff's left acromioclavicular ("AC") joint and diagnosed a probable muscle strain. Tr. at 466. A depression screen was negative. Tr. at 467.

Plaintiff followed up with Dr. Wolinsky on July 11, 2011, complaining of arthritis. Tr. at 640. Dr. Wolinsky noted swollen, non-tender structures in Plaintiff's right thigh that disappeared when his leg was elevated. *Id.* Plaintiff's arthritis was noted to be better following recent weight loss. Tr. at 641. A depression screening test was negative. Tr. at 463.

On January 31, 2012, Plaintiff presented to Tia Seals, LMSW, at the Veterans Administration ("VA") Vet Center for an intake assessment. Tr. at 799.

On February 7, 2012, Plaintiff met with Ms. Seals to discuss treatment goals, anger management coping mechanisms, and PTSD symptoms. Tr. at 798.

Plaintiff attended counseling with Ms. Seals on February 15, 2012. Tr. at 784. They discussed his stressors, which included employment and pain. *Id.* They also discussed Plaintiff's anger and how to best express it. *Id.*

On February 21, 2011, Plaintiff followed up with Ms. Seals to discuss stress management and isolation. Tr. at 797.

Plaintiff reported to Dr. Wolinsky on February 27, 2012, that he was experiencing pain in his right knee. Tr. at 440. He complained of low back pain in the left buttock and hip area, as well as in the bilateral ankles. *Id.* Dr. Wolinsky observed extreme pes planus and tenderness and puffiness over both malleoli on the left. Tr. at 441. Plaintiff had positive straight-leg raise ("SLR") bilaterally, but no deformities or tenderness to palpation. *Id.* He had a small effusion on his right knee. *Id.* He complained of pain in his bilateral hips with external rotation. *Id.* Dr. Wolinsky diagnosed arthritis in both knees, extreme pes planus, and marked chronic edema of the right leg. *Id.* He ordered x-rays and strongly recommended that Plaintiff be retrained for different work because he did not need to be climbing ladders or doing lots of walking. *Id.*

On February 28, 2012, Plaintiff had multiple x-rays performed at the Charleston VAMC. Tr. at 265–72. An x-ray of Plaintiff's lumbar spine demonstrated mild scoliosis convex left centered at the midlumbar spine. Tr. at 266–67. An x-ray of his bilateral hips was unremarkable. Tr. at 266. X-rays of his bilateral ankles and feet showed stable pes planus and bilateral ankle valgus deformities with severe soft tissue swelling. Tr. at 267–71. X-rays of Plaintiff's bilateral knees indicated mild narrowing of the medial compartment of the right knee. Tr. at 271.

Plaintiff visited the sleep apnea clinic at the Charleston VAMC on March 6, 2012. Tr. at 436–39. He reported that he was using his CPAP machine for six hours per night and that it eliminated snoring and helped him to feel more rested. Tr. at 437. Fitzgerald E. Drummond, M.D., noted excellent compliance and clinical improvement and instructed Plaintiff to continue his current settings. Tr. at 439.

4

Plaintiff followed up with Ms. Seals on March 12, 2012, to discuss stress management. Tr. at 797.

On March 13, 2012, Plaintiff had a compensation and pension examination with Stephen D. Keen, PA-S. Tr. at 337–78. Mr. Keen indicated that Plaintiff had been diagnosed with back strain, pes planus, lymphedema, hip strain, and osteoarthritis of the right knee. Tr. at 337, 355, 366. He observed the following range of motion in Plaintiff's lumbar spine: forward flexion of 25 degrees where 90 degrees is normal; extension of 5 degrees where 30 degrees is normal; right lateral flexion of 15 degrees where 30 degrees is normal; left lateral flexion of 20 degrees where 30 degrees is normal; right lateral rotation of 30 degrees or greater where 30 degrees is normal; and left lateral rotation of 30 degrees or greater where 30 degrees is normal. Tr. at 338–40. Plaintiff's right hip flexion was 90 degrees and his left hip flexion was 80 degrees, but 125 degrees is considered normal. Tr. at 356–57. Plaintiff's right knee flexion was 120 degrees and his left knee flexion was 130 degrees, but 140 degrees is considered normal. Tr. at 366–67. Mr. Keen noted tenderness to palpation along Plaintiff's paralumbar muscles and guarding and/or muscle spasm. Tr. at 341–42. He also noted tenderness to palpation in his bilateral knees. Tr. at 371. He observed the following strengths: right hip flexion was 3/5, left hip flexion was 4/5, right knee extension was 3/5, left knee extension was 4/5, bilateral ankle plantar flexion was 3/5, bilateral ankle dorsiflexion was 3/5, and bilateral great toe extension was 5/5. Tr. at 342. Mr. Keen indicated that Plaintiff had no muscle atrophy. *Id.* He observed 3+ deep tendon reflexes ("DTRs") in his bilateral knees, which was considered hyperactive without clonus, and normal DTRs in his bilateral ankles. Tr.

at 343. Plaintiff had normal sensation to light touch. *Id.* SLR was positive bilaterally. Tr. at 343–44. Mr. Keen indicated that Plaintiff had constant, moderate pain in his bilateral lower extremities; mild paresthesias and/or dysesthesias in his bilateral lower extremities; and mild bilateral radiculopathy. Tr. at 344–45. Anterior instability (Lachman test), posterior instability (Posterior drawer test), and medial-lateral instability tests were normal bilaterally. Tr. at 372. He noted that Plaintiff constantly used a brace and regularly used a cane for ambulation and stability. Tr. at 346. Mr. Keen indicated that Plaintiff's condition affected his ability to work and stated "Veteran has daily sharp shooting pains that radiate to lower extremities requiring the use of a cane and knee braces. He is unable to climb stairs without pain. He is unable to walk for greater than 50 yards." Tr. at 348. Mr. Keen also indicated that Plaintiff's flatfoot condition affected his ability to work because he had daily pain with ambulation and weight bearing. Tr. at 354.

Plaintiff attended a counseling session with Ms. Seals on March 13, 2012. Tr. at 796. They discussed stress management, and Ms. Seals suggested that Plaintiff take time for himself. *Id.*

Plaintiff followed up with Ms. Seals on March 20, 2012, to discuss PTSD, anger triggers, and alternative responses. *Id.*

On March 26, 2012, Plaintiff met with Ms. Seals to discuss his PTSD diagnosis and ways in which he could manage his stress at home and at work. *Id.*

Plaintiff followed up with Ms. Seals for counseling on April 11, 2012. *Id.* Ms. Seals discussed strategies for Plaintiff to alter his thoughts when angry. *Id.*

Plaintiff presented to the emergency department at Charleston VAMC on May 30, 2012, complaining of chest pain radiating into his right arm. Tr. at 390. A chest x-ray indicated mild cardiomegaly. Tr. at 265. Kevin O. Herman, M.D., indicated that Plaintiff's pain was non-cardiac in origin. Tr. at 391.

Plaintiff presented to George Taylor, M.D., on June 12, 2012, for a cardiology consultation. Tr. at 656. Dr. Taylor noted that Plaintiff had recently experienced atypical chest pain and had a residual heart murmur because of a small ventricular septal defect that closed when he was a child. *Id.* Dr. Taylor further indicated that Plaintiff was "very physically active, working out regularly, horsing around with his son, and working at a local plant." *Id.* An EKG indicated mild sinus tachycardia. Tr. at 657. Dr. Taylor suggested Plaintiff's pain was most consistent with musculoskeletal pain. Tr. at 658.

On June 18, 2012, Robert W. Rectenwald, M.D., provided the following opinion statement:

> Veteran has significant abnormalities of gait caused by the left knee and the pes planus. This has been going on for several years and has caused the veteran to wear braces and use a cane for ambulation. It is an established fact that abnormal gait can cause injury to other joints particularly in the case of compensatory use of other weight bearing joints such as knees and hips. It is at least as likely as not that the veteran['s] right knee arthritis and hip strain is due to the abnormal gait caused by his service connected pes planus and left knee injuries.

Tr. at 663.

On July 2, 2012, state agency consultant Jean Smolka, M.D., completed a physical residual functional capacity ("RFC") assessment in which she indicated Plaintiff had the following restrictions: occasionally lift and/or carry 20 pounds; frequently lift and/or

carry 10 pounds; stand and/or walk for a total of 2 hours; sit for a total of about six hours in an eight-hour workday; push and/or pull limited to occasional in bilateral lower extremities; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders/ropes/scaffolds. Tr. at 70–72.

Plaintiff presented to Kavya Pontzloff, M.D., on August 9, 2012, for right-sided chest pain, left hip pain, bilateral knee pain and left ankle pain. Tr. at 683. Plaintiff requested that his orthotic device and braces be replaced. *Id.* Dr. Pontzloff noted that Plaintiff appeared to be depressed, was afraid of losing his job, and had been talking to a counselor. *Id.* Dr. Pontzloff observed that Plaintiff's right lower extremity was larger and longer than his left. Tr. at 685. He had decreased range of motion of his left hip, bilateral knees, lumbar spine, and left ankle. *Id.* He also had a callus on the bottom of his left foot. *Id.* Dr. Pontzloff prescribed Citalopram for Plaintiff's depression and a combination of Diclofenac, Tramadol, and Flexeril for left hip arthralgia, bilateral knee pain, and costrochondritis. *Id.* She referred Plaintiff to physical therapy for gait retraining and requested that he receive new ankle braces and a new orthotic device. *Id.*

State agency medical consultant Cleve Hutson, M.D., completed a physical RFC assessment on September 13, 2012, in which he indicated that Plaintiff was restricted as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of 2 hours; sit for a total of about 6 hours in an eight-hour workday; push and/or pull limited to occasional with bilateral lower extremities; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders/ropes/scaffolds. Tr. at 86–87.

On September 18, 2012, Jeffrey R. Grimes, M.D., noted that he had not interviewed or examined Plaintiff, but had reviewed his file and been asked to provide an opinion. Tr. at 734. He stated Plaintiff's right knee condition and hip condition were "more likely than not related to the discrepancy in his lower extremity limb length." *Id.*

Plaintiff met with Ms. Seals on September 24, 2012. Tr. at 789. He stated he was no longer able to work because of physical challenges and endorsed increased irritability. *Id.*

Plaintiff followed up with Ms. Seals on October 29, 2012. Tr. at 788. Plaintiff was experiencing stress because of his inability to work. *Id.* He reported sleep disturbance. *Id.* He also reported that he was working to improve his communication with his family members. *Id.*

On October 29, 2012, Plaintiff presented to Debbie L. Byron, DPM, for a podiatry consultation. Tr. at 708. He complained of sharp, shooting pain to the sinus tarsi region of his ankle. *Id.* Dr. Byron observed Plaintiff's gait to be "antalgic with limp." *Id.* Plaintiff's muscle strength was 4/5. Tr. at 709. Dr. Byron indicated that Plaintiff had hemihypertrophy and edema consistent with lymphedema in the right lower extremity. *Id.* She noted that Plaintiff's right leg was one inch longer than his left. *Id.* His right foot was enlarged and rigid with decreased motion. *Id.* His longitudinal arch height was diminished bilaterally. *Id.* The digits of his left foot were contracted and his left foot was painful to palpation of the sinus tarsi. *Id.* He had crepitus in his ankle with rigidity. *Id.*

Plaintiff presented for a psychological consultative evaluation with Cashton B. Spivey, Ph.D., on December 14, 2012. Tr. at 691–94. Plaintiff endorsed feelings of

depression and sleep disturbance. Tr. at 692. He reported transient attention/concentration problems, feelings of paranoia, generalized anxiety and ruminations, nightmares, intrusive thoughts, symbolic recollections of the event, and exaggerated startle response. *Id.* He stated his appetite was satisfactory and his energy level was fair. *Id.* He denied recent crying spells, suicidal or homicidal ideation, and auditory or visual hallucinations. *Id.* Plaintiff scored 29 of a maximum 30 points on the Mini-Mental State Examination ("MMSE"). Tr. at 693. He was able to spell "world" backwards, but could not perform serial sevens. *Id.* He could recall two of three objects after five minutes. *Id.* His language skills were intact and he had a satisfactory general fund of knowledge. *Id.* His thought processes were logical and coherent and his abstract reasoning abilities were intact. *Id.* His insight and judgment were fair and he was estimated to have a low-average general intelligence score. *Id.* His attention was fair, but his concentration ranged from fair to poor. *Id.* He was able to follow a three-step command and accurately reproduce a drawing. *Id.* His affect was slightly blunted and his mood was mildly sad and mildly anxious. *Id.* Dr. Spivey diagnosed PTSD and depressive disorder, not otherwise specified. *Id.* He stated Plaintiff "may display difficulty managing funds independently and accurately" based on his inability to perform serial sevens. *Id.* He further indicated "[h]e may be capable of understanding simple instructions and performing simple tasks in the workplace," and based this assessment on Plaintiff's low-average general intelligence score. Tr. at 694.

On January 2, 2013, state agency consultant Lisa Clausen, Ph.D., completed a psychiatric review technique in which she indicated that she considered Plaintiff's

impairments under Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders. Tr. at 83. She assessed mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Clausen also completed a mental RFC assessment in which she indicated that Plaintiff was moderately limited with respect to the following abilities: interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 88.

On March 12, 2013, psychologist Sarah B. Stevens, Ph.D., performed an initial PTSD evaluation in connection with Plaintiff's claim for an increase in his VA disability benefits. Tr. at 717–28. Dr. Stevens confirmed Plaintiff's diagnosis of PTSD. Tr. at 719. She determined Plaintiff experienced, witnessed, or was confronted with an event that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others and his response involved intense fear, helplessness, or horror. Tr. at 726. She indicated the traumatic event was persistently re-experienced through recurrent and distressing recollections of the event, including images, thoughts, or perceptions; recurrent distressing dreams of the event; intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event; and physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event. *Id.* She noted Plaintiff persistently avoided stimuli associated with the trauma by making efforts to avoid thoughts, feelings, or conversations associated with the trauma; by making efforts to avoid activities, places, or

people that arouse recollections of the trauma; by demonstrating markedly diminished interest or participation in significant activities; by having a feeling of detachment or estrangement from others; and by showing a restricted range of affect (e.g., unable to have loving feelings). *Id.* Dr. Stevens indicated that Plaintiff had difficulty falling or staying asleep, irritability or outbursts of anger, difficulty concentrating, hypervigilance, and exaggerated startle response. Tr. at 726–27. Dr. Stevens specified Plaintiff had the following symptoms: depressed mood; anxiety; suspiciousness; panic attacks that occur weekly or less often; chronic sleep impairment; mild memory loss, such as forgetting names, directions, or recent events; impairment of short- and long-term memory; flattened affect; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships; and difficulty in adapting to stressful situations, including work or a work-like setting. Tr. at 727–28.

On March 21, 2013, Dr. Grimes indicated that Plaintiff's L4/L5/S1/S2/S3 nerve roots (sciatic nerve) were affected by his bilateral lower extremity radiculopathy. Tr. at 717.

Plaintiff followed up with Ms. Seals for counseling on April 23, 2013. *Id.* He indicated that he was experiencing sleep disturbance and frustration because of his inability to work. *Id.*

Plaintiff followed up with Ms. Seals on May 30, 2013. Tr. at 787. They discussed strategies for managing PTSD and stress, and Ms. Seals suggested possible hobbies that Plaintiff could participate in to decrease his stress level. *Id.*

Plaintiff followed up with Dr. Pontzloff on July 2, 2013, to have a social security disability questionnaire completed. Tr. at 748. Dr. Pontzloff observed right lower extremity edema and decreased range of motion of Plaintiff's right hip, right knee, and bilateral ankle and foot. Tr. at 750. Plaintiff walked with a limp. *Id.* She refilled Plaintiff's medications and suggested a referral to the mental health center, but Plaintiff refused the referral. *Id.*

Plaintiff met with Ms. Seals on July 9, 2013, to discuss management of stress and PTSD symptoms. Tr. at 786. Plaintiff indicated that he was frustrated by his inability to work. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on July 15, 2013, Plaintiff testified he had a driver's license and drove himself to the hearing. Tr. at 30.

Plaintiff testified that he had not worked since April 25, 2012, and collected no unemployment or Workers' Compensation. *Id.* He stated he was receiving disability benefits from the VA. *Id.*

Plaintiff testified he was unable to work because of his medications, his mental health, and pain in his low back, shoulder, knees, feet, and ankles. Tr. at 31. He stated his pain was constant, but decreased after he took his medications. *Id.* He indicated his medications caused drowsiness, sleepiness, and inability to focus. *Id.*

Plaintiff testified that he could sit for 20 minutes, stand for 30 minutes, and walk for 20 to 25 minutes on level ground. Tr. at 32. He stated he always used a cane to ambulate. Tr. at 48. He experienced swelling in his ankles and feet when standing and elevated his feet 80 percent of the time when sitting to reduce the swelling. Tr. at 32, 48–49. Plaintiff testified he experienced sharp pain in his legs, back, hips, and feet after sitting for 20 minutes. Tr. at 32. He endorsed no problem using his hands. Tr. at 34.

Plaintiff stated he received treatment at the VAMC. Tr. at 31. He testified that his doctors indicated his back pain was caused by a curvature in his back. Tr. at 32. He also had a leg-length discrepancy. Tr. at 33. He stated that he attended counseling twice a month at the VA Vet Center. Tr. at 34.

Plaintiff stated he used alcohol when stressed. Tr. at 37. He testified he spent most of his days inside his house and frequently checked the locks and looked out the windows. *Id.* Plaintiff indicated that he experienced frustration when in traffic and with crowds and lines in Wal-Mart. *Id.* He had difficulty dealing with others on a one-on-one basis if he felt that they were being disrespectful. Tr. at 38.

Plaintiff testified he experienced nightmares and flashbacks after observing a helicopter crash and its aftermath. 46–47. He stated that his flashbacks were triggered by the sounds of aircraft. Tr. at 47.

Plaintiff testified he lived in a house with his wife and son. Tr. at 38. He stated his wife worked during the day and that his eight-year-old son stayed in the house with him. *Id.* He took care of his personal needs and performed some household chores at his own

14

pace, but could not maintain his lawn. Tr. at 38–39. He testified that he would lie in bed when he felt dizzy or in pain. Tr. at 39.

Plaintiff testified that his medications affected his ability to focus and caused him to fall asleep. Tr. at 42–43. He stated he called his wife or a neighbor to watch his son when he took Cyclobenzaprine. Tr. at 44–45.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Tonetta Watson-Coleman reviewed the record and testified at the hearing. Tr. at 53–59. The VE categorized Plaintiff's PRW as a fast food cook, *Dictionary of Occupational Titles* ("*DOT*") number 313.374-010, as medium in exertional level with a Specific Vocational Preparation ("SVP") of 5; an aircraft maintenance worker, *DOT* number 621.281-014, as medium in exertional level with an SVP of 7; a milk inspector, *DOT* number 222.485-010, as medium in exertional level with a SVP of 3; a heavy equipment operator, *DOT* number 859.683-010, as medium in exertional level with an SVP of 6; and a milk receiver, *DOT* number 410.357-010, as medium in exertional level with an SVP of 4. Tr. at 53–54. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and carry 20 pounds occasionally and 10 pounds frequently; could sit for 6 hours and stand and walk for two hours in a normal workday; could not crawl, kneel, or climb; could occasionally crouch; was limited to simple, repetitive tasks with no ongoing interaction with the general public; and could not work in a team setting. Tr. at 54. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical

person could perform. *Id.* The VE identified jobs as surveillance system monitor, *DOT* number 379.367-010, with 550 jobs in South Carolina and 74,470 in the national economy; weight tester, *DOT* number 539.485-010, with 8,750 jobs in South Carolina and 434,170 jobs in the national economy; and addresser, *DOT* number 209.587-010, with 500 jobs in South Carolina and 96,330 jobs in the national economy. Tr. at 54–55. The ALJ added an additional limitation to include no fast-paced production environment. Tr. at 55. The VE testified that the additional restriction would not affect the jobs identified. *Id.* The ALJ asked if the hypothetical worker could perform any jobs if, secondary to the effects of medications and symptoms, he could be expected to be off task for at least 20 percent of the workday. *Id.* The VE testified that would eliminate all jobs. *Id.*

Plaintiff's attorney asked the VE if having to elevate his legs at waist-level during 80 percent of his time while seated would eliminate Plaintiff's ability to perform the jobs identified. Tr. at 57–59. The VE indicated that it would. Tr. at 59.

### 2. The ALJ's Findings

In his decision dated September 3, 2013, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
2. The claimant has not engaged in substantial gainful activity since April 25, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: degenerative joint disease, Post Traumatic Stress Disorder (PTSD), and sleep apnea (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part

404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: sit for 6 hours of an 8-hour day; stand/walk for 2 hours of an 8-hour day; frequently lift/carry 10 pounds; occasionally lift 20 pounds; never crawl, kneel or climb; and occasionally crouch. He would be further limited to simple, repetitive tasks with: no ongoing interaction with the general public; no work in a team setting; and no fast-paced production work.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on January 26, 1978 and was 34 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, and 404.1569(a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from April 25, 2012, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 13–20.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    The ALJ failed to analyze Dr. Stevens's opinion;

2)    The ALJ improperly evaluated Dr. Luecken's opinion;

3)    The ALJ failed to analyze Ms. Seals's opinion; and

4)    The ALJ neglected to properly analyze and accord appropriate weight to Dr. Pontzloff's opinion.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year,

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from

---

he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the

20

Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p *quoting* 20 C.F.R. §§ 404.1527(a)(2). If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record).

Pursuant to SSR 96-2p:

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.

SSA rules require that the ALJ carefully consider medical opinions on all issues. SSR 96-5p. Pursuant to 20 C.F.R. § 404.1527(c), if a treating source's opinion is not accorded controlling weight, the ALJ should consider "all of the following factors" to determine the weight to be accorded to every medical opinion in the record: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship; supportability; consistency with the record as a whole; specialization of the medical source; and other factors. *See also Johnson*, 434 F.3d at 654.

### 1.    Dr. Stevens's Opinion

Dr. Stevens specified that Plaintiff had "occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation." Tr. at 721.

Plaintiff argues that the ALJ erred in failing to consider and weigh Dr. Stevens's medical opinion. [ECF No. 11 at 18]. Plaintiff submits that the ALJ made no mention of Dr. Stevens's opinion or treatment record and failed to comply with the requirements of 20 C.F.R. § 404.1527. [ECF No. 11 at 18–19].

The Commissioner argues that Dr. Stevens did not render an opinion that the ALJ was required to weigh. [ECF No. 12 at 5]. The Commissioner further argues that if Dr. Stevens's statements constituted an opinion, the ALJ's failure to weigh them was harmless because his RFC assessment was consistent with the statements. [ECF No. 12 at 6].

"Although an ALJ is required by Social Security regulations to assign weight to all medical opinions, *see* 20 C.F.R. § 416.927(e)(2)(ii), an ALJ's failure to expressly state the weight given to a medical opinion may be harmless error when the opinion is consistent with the ALJ's RFC determination." *Davis v. Colvin*, No. 12-2244-CMC-BM, 2014 WL 172513, at *2 (D.S.C. Jan. 15, 2014) *citing Morgan v. Barnhart*, 142 F. App'x 716, 722–23 (4th Cir. 2005) (holding that any error in failing to credit a medical opinion was harmless where the ALJ incorporated results of functional capacity exam, which was consistent with medical opinion, into plaintiff's RFC); *Rivera v. Colvin*, No. 5:11-CV-569-FL, 2013 WL 2433515 (E.D.N.C. June 4, 2013) ("ALJ's failure to expressly state the weight given to a medical opinion may be harmless error, when the opinion is not relevant to the disability determination or when it is consistent with the ALJ's RFC determination.").

The undersigned recommends a finding that the ALJ failed to consider Dr. Stevens's opinion as required by 20 C.F.R. § 404.1527. Dr. Stevens's statement meets the definition of a medical opinion set forth in 20 C.F.R. § 404.1527(a)(2) because Dr. Stevens is a psychologist who provided a statement that reflected her judgment about Plaintiff's mental restrictions. Therefore, the ALJ was required to consider Dr. Stevens's statement in accordance with the requirements of 20 C.F.R. § 404.1527(c).

The undersigned further recommends a finding that the ALJ's failure to weigh Dr. Stevens's opinion was not harmless error. The Commissioner argues that the ALJ's failure to consider Dr. Stevens's opinion is similar to the ALJ's omission in *Davis* and that the ALJ's RFC determination was consistent with Dr. Stevens's opinion, which

rendered the ALJ's failure to explicitly consider the opinion to be harmless error. [ECF No. 12 at 6]. However, this case is distinguishable from *Davis*. In *Davis*, the plaintiff argued that the ALJ neglected to include particular restrictions set forth in the psychologist's opinion and to indicate the weight accorded to the opinion, but here the issue is whether Dr. Stevens's opinion was considered at all. In *Davis*, the ALJ considered the doctor's opinion because he specifically cited to it in his decision, but this ALJ made no mention of Dr. Stevens's opinion or even her examination. *See* 2014 WL 172513, at *2, n.3. Similarly, in *Morgan*, the ALJ specified that he considered the opinion at issue. *See* 142 F. App'x at 722 ("Opinions on issues reserved to the Commissioner, such as [those] of Dr. Holford, can never be entitled to controlling weight . . . . I give greater weight to the results of actual testing [i.e., the FCE,] than I do the opinion of Dr. Holford."). The omission here was more significant than those alleged in *Davis* and *Morgan*.

The instant case is further distinguished from *Davis* and *Morgan* in that the ALJ's RFC determination was not consistent with Dr. Stevens's opinion. The ALJ determined that Plaintiff was limited to simple and repetitive tasks without ongoing public interaction, work in a team setting, or fast-paced production work. *See* Tr. at 15. Dr. Stevens indicated that Plaintiff would experience occasional decreases in work efficiency and intermittent periods of inability to complete tasks.[3] *See* Tr. at 721. These restrictions pertain to Plaintiff's ability to remain on task in a work setting. While the ALJ's RFC

---

[3] The undersigned recognizes that the terms "occasional" and "intermittent" are subjective terms and that clarification may be needed to determine their precise vocational implications.

determination restricted Plaintiff to a narrow field of unskilled work, it did not consider his ability to remain on task in such a setting and was unlike Dr. Stevens's opinion. In light of the foregoing, the undersigned is unable to conclude that the ALJ's error is consistent with those determined to be harmless in *Davis* and *Morgan*.

2.    Dr. Luecken's Opinion

The record contains a letter dated May 15, 2012, and labeled "primary care work excuse." Tr. at 396. The document is typed and closes with "Sincerely, Robert Luecken, M.D.," but it is electronically signed by Joseph C. Trevino, RN. *Id.* The letter indicates that Plaintiff is a patient at the Goose Creek VA Clinic who is treated for bilateral knee arthritis, extreme pes planus, and marked chronic edema in the right leg. *Id.* The letter further indicates "[h]e is able to return to work but strongly recommended he avoid ladders or doing lots of walking." *Id.*

Plaintiff argues that the ALJ erred in according significant weight to the opinion of Dr. Luecken, where there is no evidence in the record to suggest that Dr. Luecken examined Plaintiff. [ECF No. 11 at 19]. Plaintiff maintains that he was never treated by Dr. Luecken and Dr. Luecken merely signed an authorization at his request so that he could attempt to return to work. [ECF No. 11 at 19–20]. Plaintiff contends that the ALJ erroneously based his decision to accord significant weight to Dr. Luecken's opinion on a non-existent longitudinal treatment relationship. [ECF No. 11 at 20].

The Commissioner argues that the ALJ's error in weighing Dr. Luecken's opinion was harmless because Dr. Luecken's opinion was consistent with the opinions of the state agency physicians. [ECF No. 12 at 7].

25

The ALJ addressed Dr. Luecken's statement as follows:

I accord significant weight to the assessment of Dr. Robert Luecken, a primary care provider treating the claimant for arthritis, pes planus, chronic edema, that the claimant is able to work, but should not climb ladders or perform prolonged walking (Exhibit 2F/132). This opinion is supported by the objective evidence of record and is based on Dr. Luecken's longitudinal treating relationship with the claimant.

Tr. at 17.

The undersigned recommends a finding that the ALJ erred in according significant weight to Dr. Leucken's assessment. The undersigned's review of the record reveals that Plaintiff was not treated by Dr. Luecken. On May 14, 2012, Plaintiff contacted the VAMC to report that he had been absent from work for three weeks and to request a letter releasing him to return to work. Tr. at 396. Plaintiff was contacted by Mr. Trevino on May 15, 2012, and they discussed the request. Tr. at 398. The record suggests that Mr. Trevino then reviewed the notes from Plaintiff's February 27, 2012, primary care visit with Dr. Wolinsky and drafted the letter based on those notes. There is no indication in the record that Dr. Luecken reviewed Plaintiff's records or even reviewed the opinion. Thus, the ALJ accorded significant weight to an opinion rendered three weeks after Plaintiff stopped working, provided in response to his request for an authorization to return to work, and that includes the name of a physician who never saw him and who may not have even reviewed his records.

The undersigned recommends a finding that the ALJ's decision to accord significant weight to Dr. Luecken's opinion was not harmless error. The Commissioner concedes that Dr. Luecken did not treat Plaintiff, but argues that the ALJ's error is

harmless because he relied upon other evidence to make his decision. In *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994), the Fourth Circuit indicated that an ALJ's mistake may be considered harmless error where the ALJ conducted the proper analysis in a comprehensive fashion, cited substantial evidence to support his finding, and would have reached the same result notwithstanding his initial error. The undersigned is unable to find that the ALJ's mistake meets these criteria for several reasons. First, the ALJ's statement in support of Dr. Luecken's opinion raises questions as to whether the ALJ actually conducted the proper analysis in a comprehensive fashion. Second, the evidence that he cited to support his finding was incorrect and, thus, cannot provide substantial evidence to support his decision. The ALJ indicated that he was relying on the opinion of a treating physician based on a longitudinal treatment relationship. *See* Tr. at 17. Social Security regulations and rulings give particular deference to the opinions of treating physicians based on their longitudinal treatment histories. *See* 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. Removing Dr. Luecken's status as a treating physician and recognizing that he never treated Plaintiff means that the ALJ relied upon evidence that carried no particularly significant weight. Third, because of the deference given to a treating physician's opinion, it is impossible to determine if the ALJ would have reached the same result notwithstanding his initial error.

### 3.    Ms. Seals's Opinion

Tia Jordan Seals, LMSW, provided a letter to the VA Regional Office on April 16, 2012, indicating that Plaintiff had attended weekly individual counseling sessions for PTSD since January. Tr. at 695. Ms. Seals indicated that Plaintiff's PTSD interfered with

his ability to function effectively. She noted that he reported disturbance of motivation and mood and displayed flattened affect during therapy sessions. *Id.* She stated he had a guarded prognosis, but had followed all treatment recommendations. *Id.*

On September 24, 2012, Ms. Seals drafted a letter to the disability examiner in which she indicated that Plaintiff was initially assessed in the Charleston Vet Center on January 31, 2012, and began treatment on February 7, 2012, for PTSD. Tr. at 689. She stated Plaintiff "was a recommended referral to the Charleston Vet Center due to ongoing clinically significant distress which was occurring in social and occupational areas." *Id.* She noted that Plaintiff had a positive prognosis. *Id.*

Plaintiff argues that the ALJ failed to indicate specific consideration of the factors required for evaluating opinion evidence and failed to explain how Ms. Seals' opinion was contrary to substantial evidence. [ECF No. 11 at 22]. Plaintiff maintains that while Ms. Seals did not indicate specific restrictions, the ALJ should not have discounted her opinion and should have contacted Ms. Seals for additional evidence needed to resolve the issue. [ECF No. 11 at 22–23]. Plaintiff contends that the ALJ also mischaracterized elements of his treatment with Ms. Seals, including the length and frequency of treatment. [ECF No. 11 at 23].

The Commissioner argues that the ALJ appropriately accorded less weight to Ms. Seals's opinion because she was not an acceptable medical source and she did not provide specific limitations. [ECF No. 12 at 9]. The Commissioner maintains that the ALJ was not required to contact Ms. Seals for clarification because he had adequate information on which to determine whether Plaintiff was disabled. [ECF No. 12 at 9–10].

The Commissioner argues that the ALJ adequately characterized Plaintiff's treatment with Ms. Seals based on the longitudinal record of treatment. [ECF No. 12 at 9, n.1].

Pursuant to 20 C.F.R. § 404.1527(b), the ALJ must consider all relevant evidence in the case record when determining whether a claimant is disabled. *See also* SSR 06-3p. Medical opinions may only be rendered by "acceptable medical sources," which include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-3p; *see* 20 C.F.R. § 404.1513(a). "Other sources" are defined as individuals other than acceptable medical sources and include medical providers, such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists, as well as non-medical sources, such as educational personnel, social welfare agency personnel, rehabilitation counselors, spouses, parents, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. § 404.1513(d). Medical opinions must be considered based on the criteria set forth in 20 C.F.R. § 404.1527(c), but opinions from "other sources" are not medical opinions. SSR 06-3p. While the factors in 20 C.F.R. § 404.1527(c) do not have to be explicitly considered when evaluating the opinions of other medical sources, they represent basic principles for the consideration of all opinion evidence. *Id.* "The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case," and should be based on "consideration of the probative value of the opinions and a weighing of all evidence in that particular case." *Id.*

The ALJ stated the following with respect to Ms. Seals's opinion:

> I note that while Tina [sic] Seals, LMSW, a treating counselor has made a medical opinion regarding the claimant's functional limitations, a counselor is not considered an "acceptable medical source" as defined in 20 C.F.R. §§ 404.1514 and 416.913, and therefore her opinion is not accorded controlling weight. 20 C.F.R. 404.1527(d)(2), 416.927(d)(2), and Social Security Rulings 06-3p and 96-3p (Exhibits 6F, 8F). However, I give some weight to her assessment that Post Traumatic Stress Disorder affects the claimant's ability to function effectively, but note that she has failed to identify what [sic] the specific limitations caused by this condition.

Tr. at 18.

The ALJ later noted "I have considered Ms. Seals's opinion in restricting the claimant from working in a fast-paced production environment." Tr. at 19.

The undersigned recommends a finding that the ALJ properly considered Ms. Seals's statements. Because Ms. Seals was a social worker, her statements did not meet the definition of a medical opinion in 20 C.F.R. § 404.1513(a) and did not have to be explicitly considered using the criteria set forth in 20 C.F.R. § 404.1527(c). The ALJ was required to consider the evidence, which he did when he addressed the lack of specific limitations in Ms. Seals's statements and indicated that he considered them in restricting Plaintiff from working in a fast-paced production environment. The undersigned further recommends a finding that the ALJ was not required to re-contact Ms. Seals to obtain information about Plaintiff's specific limitations because the record contained additional evidence that addressed Plaintiff's psychological limitations. Finally, the undersigned rejects Plaintiff's argument that the ALJ mischaracterized the frequency of his treatment with Ms. Seals. The ALJ indicated that Plaintiff treated with Ms. Seals twice a month, which is consistent with Plaintiff's testimony and with the medical evidence. *See* Tr. at 16, 34, 771–72.

4.    Dr. Pontzloff's Opinion

On July 2, 2013, Dr. Pontzloff completed a medical statement form. Tr. at 696–98. Dr. Pontzloff indicated Plaintiff's diagnoses included bilateral pes planus, left foot sinus tarsitis, lymphedema of the right leg, right knee pain, and right hip joint pain. Tr. at 696. She indicated Plaintiff was physically limited as follows: stand for 15 minutes at a time; sit for 30 minutes at a time; work for four hours per day; occasionally lift 20 pounds; frequently lift five pounds; occasionally bend; never stoop; constantly manipulate the bilateral hands; frequently raise the bilateral arms over shoulder level; and frequently elevate the legs during an eight-hour day. Tr. at 696–97. She indicated Plaintiff was markedly impaired in his ability to accept supervision and get along with coworkers. Tr. at 697–98. She wrote "[p]er patient, he can not accept supervisors['] and coworkers['] suggestions and comments. He states he prefers to work by himself. The restrictions he has stated are per discussion with the patient." Tr. at 698. She also indicated that Plaintiff had moderate psychological impairment with respect to the abilities to understand, remember, and carry out detailed instructions and maintain attention and concentration. Tr. at 697. She noted Plaintiff was not significantly impaired in the ability to understand, remember, and carry out very short and simple instructions; the ability to work with others; and the ability to interact appropriately with the general public. *Id.*

Plaintiff argues that the ALJ failed to evaluate Dr. Pontzloff's opinion based on the criteria set forth in 20 C.F.R. §404.1527(c). [ECF No. 11 at 24]. Plaintiff further argues that the ALJ failed to explain his reason for according little weight to Dr. Pontzloff's opinion. [ECF No. 11 at 25]. Plaintiff contends that the evidence supports Dr.

31

Pontzloff's opinion. [ECF No. 11 at 25–26]. Plaintiff further argues that, while the ALJ indicated that he gave significant weight to the opinions of the state agency medical consultants, he did not indicate who the physicians were, what their opinions were, or how their opinions were consistent with specific evidence in the record. [ECF No. 11 at 25].

The Commissioner argues that any error on the part of the ALJ in characterizing Dr. Pontzloff's opinion as vocational as opposed to medical was harmless because she gave other reasons for giving less weight to the opinion. [ECF No. 12 at 11]. The Commissioner maintains that the ALJ was not required to identify evidence that was contrary to Dr. Pontzloff's opinion because the ALJ concluded that the opinion was supported only by Plaintiff's subjective complaints and not supported by objective evidence. *Id.* The Commissioner argues that the ALJ could rely on the fact that the state agency consultants' opinions were in the record and did not have to explain the restrictions they imposed to support his conclusion regarding Dr. Pontzloff's opinion. [ECF No. 12 a 12]. The Commissioner contends that merely because Plaintiff can point to evidence indicating that his physical functioning was limited does not mean that the ALJ's decision was not supported by substantial evidence. [ECF No. 12 at 13].

The ALJ indicated the following with respect to Dr. Pontzloff's opinion:

> I give little weight to the assessment of Dr. Kanya Pontzloff from July 2013 regarding her specific limitations of her residual functional capacity for less than the full range of sedentary work (Exhibit 9F). The treating physician's opinion is more of a vocational opinion than a medical opinion and thus is not worthy of great weight. Dr. Pontzloff's assessment was based primarily on the claimant's subjective symptoms, which, for reasons stated in detail above, are not reliable. Additionally, the doctor's assessment was devoid of

any explanation, rationale, clinical findings, or reference to objective testing. The lack of substantial support from the other objective evidence of record also renders the opinion less persuasive. There is no objective evidence to support her report that the claimant must frequently elevate his legs during the day or that she [sic] could only work for a total of 4 hours in one workday. As to the recommendations regarding the claimant's ability to get along with others, I accord this portion of the assessment no weight as the doctor's report clearly states that these limitations are based on the claimant's report of "anger issues" and that he cannot accept suggestions/comments from co-workers/supervisors and prefers to work alone.

Tr. at 17–18.

The undersigned recommends a finding that the ALJ failed to adequately assess Dr. Pontzloff's opinion. Contrary to the ALJ's conclusion, Dr. Pontzloff's opinion was a medical opinion as defined in 20 C.F.R. § 404.1527(a)(2). Dr. Pontzloff was Plaintiff's treating physician, and she provided a statement that reflected her judgment about his impairments, symptoms, diagnoses, and restrictions. Therefore, her opinion had to be considered as indicated in 20 C.F.R. § 404.1527.

Even if we are to accept the ALJ's rationale suggesting that Dr. Pontzloff's opinion was not entitled to controlling weight, her opinion was still entitled to deference and required to be weighed based on the factors set forth in 20 C.F.R. § 404.1527(c). While the ALJ recognized that Dr. Pontzloff was Plaintiff's treating physician, he neglected to address the treatment relationship. *See* Tr. at 17. He addressed the supportability of Dr. Pontzloff's statement when he concluded that her assessment "was devoid of any explanation, rationale, clinical findings, or reference to objective testing." However, the ALJ's conclusion ignored Dr. Pontzloff's findings on prior examinations that were consistent with her opinion. On August 9, 2012, Dr. Pontzloff observed

Plaintiff's right lower extremity to be larger and longer than his left. Tr. at 685. She also noted decreased range of motion in Plaintiff's left hip, bilateral knees, lumbar spine, and left ankle. *Id.* On July 2, 2013, Dr. Pontzloff observed Plaintiff to have right lower extremity edema; to walk with a limp; and to demonstrate decreased range of motion in his right hip, right knee, bilateral ankles, and bilateral feet. Tr. at 750.

The ALJ also erroneously concluded that there was a "lack of substantial support from the other objective evidence of record" because the record contained objective evidence and observations from other medical providers that were consistent with Dr. Pontzloff's opinion. On September 17, 2009, Dr. Massey, an orthopedist, noted that Plaintiff had a limp and leg-length inequality; that his right leg was larger than his left; that he demonstrated crepitus on the right; and that he had bilateral quad weakness. Tr. at 483. On July 11, 2011, Dr. Wolinsky observed swollen, non-tender structures in Plaintiff's right thigh that disappeared when his leg was elevated. Tr. at 640. On February 27, 2012, Dr. Wolinsky observed extreme pes planus, tenderness and puffiness over both malleoli on the left, and positive SLR. Tr. at 441. On February 28, 2012, Plaintiff had x-rays that showed mild scoliosis in his spine, pes planus, bilateral ankle valgus deformities, soft tissue swelling in the ankles, and mild narrowing of the medial compartment of his right knee. Tr. at 266–71. On March 13, 2012, Mr. Keen observed decreased range of motion in Plaintiff's lumbar spine; decreased hip and knee flexion; tenderness in his lumbar spine and knees; decreased strength in his hips, knees, and ankles; hyperactive DTRs; and positive SLR. Tr. at 341–44, 371. On October 29, 2012, Dr. Byron observed Plaintiff to have an antalgic gait with a limp; hemihypertrophy and

edema consistent with lymphedema of the right lower extremity; a leg-length discrepancy with the right leg being one inch longer than the left; enlargement and rigidity of the right foot with decreased motion; decreased bilateral arch height; contracted digits on the left foot; and ankle crepitus. Tr. at 708–09.

In light of the ALJ's failure to address Plaintiff's treatment relationship with Dr. Pontzloff and to consider her opinion in light of the evidence discussed above, the undersigned recommends that the claim be remanded for reconsideration of Dr. Pontzloff's opinion.

The undersigned further recommends a finding that the ALJ's reliance on the state agency physicians' opinions fails to provide substantial evidence to support his decision. The ALJ indicated that he accorded "significant weight" to Dr. Luecken's assessment, "significant weight" to the medical opinions of the state agency consultants, unspecified "weight" to Dr. Spivey's opinion, "some weight" to Ms. Seals's opinion, and "little weight" to Dr. Pontzloff's opinion. Tr. at 17–18. Based on the undersigned's recommendations regarding Dr. Stevens's opinion, Dr. Luecken's statement, and Dr. Pontzloff's opinion, the undersigned is unable to find that substantial evidence supports a decision that hinges significantly on the opinions of the state agency consultants where the ALJ neglected to provide any indication of the specific limitations identified in those opinions. *See* Tr. at 18.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based

on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

October 27, 2014                           Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).